478

[No. 18963-5-III.   Division Three.   January 25, 2001.]

KAREN WRIGHT, ET AL., *Appellants*, v. MILAN JECKLE, ET AL., *Respondents*.

*Robert J. Crotty* and *Darrell W. Scott* (of *Lukins & Annis, P.S.*); *Lynn L. Sarko, Britt L. Tinglum, Amy N. Hanson*, and *Michael D. Woerner* (of *Keller, Rohrback*); and *David L. Ashbaugh* (of *Stanislaw, Ashbaugh*), for appellants.

*William F. Etter, Raymond F. Clary*, and *Susan W. Troppmann* (of *Etter & McMahon*), for respondents.

SWEENEY, J. — The dispositive issue in this case is whether the advertising, marketing, and sale of diet drugs can implicate the entrepreneurial aspects of medicine in a

way that accommodates a Consumer Protection Act cause of action or whether, instead, the claims here fall under the umbrella of chapter 7.70 RCW (Actions for Injuries Resulting From Health Care) and must therefore fit within one of the three statutorily prescribed causes of action—negligence, contract, or lack of informed consent. RCW 7.70.030. We conclude that Dr. Milan Jeckle's diet drug sales implicate the entrepreneurial aspects of medicine and therefore reverse the trial court's summary dismissal of the plaintiffs' claims.

## FACTS

Dr. Milan Jeckle prescribed the diet drugs fenfluramine and phentermine (fen-phen) and/or dexfenfluramine (Redux) for Karen Wright, Rosa Lee Johnson, and Karla Seastrom (collectively Wright). Dr. Jeckle does business in Spokane as All Valley Medical.

Dr. Jeckle advertised the "Dr. Jeckle's Fen-Phen Medical Weight Loss Program" in the *Nickel Nik* and *Spokesman Review*. The advertisements solicited patients for the use of fen-phen. Dr. Jeckle advertised fen-phen as "safe." The drugs were not approved for concomitant use by the Federal Drug Administration. He also set up a system of free drawings for fen-phen and distributed a newsletter. The newsletter included testimonials from fen-phen users and encouraged the use of fen-phen.

Dr. Jeckle required that his patients purchase fen-phen directly from his office. Patients were not allowed to purchase fen-phen from independent pharmacists. And Dr. Jeckle directly profited from the sale of fen-phen.

Wright filed a class action complaint alleging Dr. Jeckle had violated the Consumer Protection Act (CPA). The second amended complaint alleges Dr. Jeckle violated the CPA and breached a fiduciary duty to Wright. Specifically, Wright claims Dr. Jeckle's advertising, marketing, and sales of fen-phen were done as part of the entrepreneurial aspect of his practice. Wright asked for an order requiring

Dr. Jeckle to disgorge the money he received from the sale of fen-phen. Wright then moved for certification of a class of plaintiffs.

Dr. Jeckle resisted Wright's motion for certification and moved to dismiss Wright's complaint pursuant to CR 12(b)(6) (failure to state a claim). The trial court granted Dr. Jeckle's motion to dismiss.

## DISCUSSION

█ █ CR 12(b)(6) Standard of Review. We review dismissal of a claim under CR 12(b)(6) de novo. *Reid v. Pierce County*, 136 Wn.2d 195, 200-01, 961 P.2d 333 (1998); *Cutler v. Phillips Petroleum Co.*, 124 Wn.2d 749, 755, 881 P.2d 216 (1994). Dismissal is appropriate only if the complaint alleges no facts that would justify recovery. *Reid*, 136 Wn.2d at 200-01. We accept the plaintiffs' allegations and any reasonable inferences as true. *Id.* at 201. And for that reason CR 12(b)(6) motions should be granted sparingly and with care. *Cutler*, 124 Wn.2d at 755.

█ Cause of Action—Health Care. Chapter 7.70 RCW modified both the procedure and substance of causes of action based on health care. *Branom v. State*, 94 Wn. App. 964, 968-69, 974 P.2d 335, *review denied*, 138 Wn.2d 1023 (1999). The legislation sweeps broadly; it includes causes of action in contract and tort. *Id.* at 969. Chapter 7.70 RCW governs any action for damages based on an injury resulting from health care—exclusively. *Id.*

█ The phrase "health care" is not defined in chapter 7.70 RCW. *Branom*, 94 Wn. App. at 969. Washington courts have defined it as " 'the process in which [a physician is] utilizing the skills which he [or she] had been taught in examining, diagnosing, treating or caring for the plaintiff as his [or her] patient.' " *Id.* at 969-70 (quoting *Estate of Sly v. Linville*, 75 Wn. App. 431, 439, 878 P.2d 1241 (1994)) (first alteration in original).

Dr. Jeckle advertised, marketed, and sold fen-phen. Wright argues that his activity exclusively implicates the

entrepreneurial aspect of his medical practice. And therefore Dr. Jeckle may be sued under the CPA for his non-health care activities.

■■■■ Entrepreneurial Aspect of Medicine. Whether professional conduct implicates entrepreneurial aspects of a profession is a question of fact. *Eriks v. Denver*, 118 Wn.2d 451, 465, 824 P.2d 1207 (1992) (citing *Quimby v. Fine*, 45 Wn. App. 175, 182, 724 P.2d 403 (1986)). We take the plaintiff's allegations as true for purposes of CR 12(b)(6). *Reid*, 136 Wn.2d at 201. The question is not whether Dr. Jeckle engaged in entrepreneurial activities. We assume that he did for purposes of this review. The question is whether a doctor may be sued for consumer protection violations when the suit is based on these entrepreneurial activities.

Wright relies primarily on three cases. *Short v. Demopolis*, 103 Wn.2d 52, 691 P.2d 163 (1984); *Linville*, 75 Wn. App. 431; *Quimby*, 45 Wn. App. 175.

In *Demopolis*, our Supreme Court held that "certain entrepreneurial aspects of the practice of law may fall within the 'trade or commerce' definition of the CPA." *Demopolis*, 103 Wn.2d at 60. The court gave these examples: "how the price of legal services is determined, billed, and collected and the way a law firm obtains, retains, and dismisses clients." *Id.* at 61. The court held these aspects are a legitimate concern of the public and, therefore, properly subject to the CPA. *Id.* Claims for malpractice and negligence in the practice of law are not subject to the CPA because they focus on the actual competence of the underlying legal service. *Id.* at 61-62; *see also Eriks*, 118 Wn.2d at 464.

In *Quimby*, the court held that the reasoning of *Demopolis* (a CPA action can apply to the entrepreneurial aspects of a lawyer) applied with equal force to the medical profession. *Quimby*, 45 Wn. App. at 180. *Quimby* was a claim of medical malpractice based on the failure of a physician to properly inform the plaintiff of the risks and

hazards associated with a sterilization procedure. The court held that the lack of informed consent claim (countenanced by RCW 7.70.050(1)(b)) "may be within the scope of the Consumer Protection Act, if it relates to the entrepreneurial aspects of the medical practice." *Quimby*, 45 Wn. App. at 181.

Dr. Jeckle argues that *Quimby* stands for the proposition that a patient's CPA action must necessarily include, or fall within, the informed consent claim authorized again by RCW 7.70.050. We do not read *Quimby* that way. While it is true that *Quimby* involved a claim of failure to fully inform, the court's discussion under the "Consumer Protection Act" heading simply articulates the principle already spelled out in *Demopolis*; that is, that the learned professions are not immune at common law or under the medical tort reform act (chapter 7.70 RCW) from CPA claims.

The final case cited by Wright is *Linville*. In *Linville* one of Mr. Sly's physicians, Dr. Linville, made misrepresentations, allegedly about the quality of care Mr. Sly received at the hands of another physician. *Linville*, 75 Wn. App. at 434. The question before the court was whether or not the representations were "medical care" and therefore subject to an eight-year statute of limitation (RCW 4.16.350[1]) or whether instead the misrepresentations did not implicate medical care and, therefore, were not subject to the eight-year statute of limitation. The court concluded that the mere fact "that the misrepresentations were made during the course of a physician/patient relationship does not automatically render them 'health care' for purposes of the statute of limitation." *Linville*, 75 Wn. App. at 440.

The lesson from these cases is that not all aspects of the physician/patient relationship constitute health care. And the mere fact that advice is given, or representations are made, does not rule out the possibility that they may in fact implicate the entrepreneurial aspects of the professional

---

[1] RCW 4.16.350 provides a specific statute of limitation period for claims based on health care injuries. The statute states: "in no event shall an action be commenced more than eight years after [the cause of the injury.]" RCW 4.16.350.

relationship. At least the relationship itself does not preclude the potential for a claim based upon the entrepreneurial aspect of the profession, be it legal or medical.

Informed Consent. Dr. Jeckle relies on *Benoy v. Simons*[2] to support his contention that CPA claims must necessarily fall within a claim of lack of informed consent (a claim authorized by RCW 7.70.050(1)(b)). In *Benoy*, the plaintiffs alleged a breach of the standard of care, failure to obtain informed consent, violation of the CPA, and intentional infliction of emotional distress. *Benoy*, 66 Wn. App. at 60. The trial court dismissed all claims. *Id.* We affirmed. *Id.* at 65.

On review, we concluded that there was no supportable informed consent claim, no showing of an improper entrepreneurial motive, and no showing of a resulting injury: "To maintain a CPA claim there must be a showing of a lack of informed consent resulting from dishonest and unfair practices motivated by financial gain." *Benoy*, 66 Wn. App. at 65 (citing *Quimby*, 45 Wn. App. 175).

*Benoy* is easily distinguishable. There, plaintiff Benoy did not show any entrepreneurial activities—activities motivated by financial gain only. *Benoy*, 66 Wn. App. at 65. Here, Wright has specifically alleged Dr. Jeckle engaged in improper entrepreneurial activities that were motivated by financial gain—financial gain only. Moreover, *Benoy* does not limit a CPA cause of action to the showing of lack of informed consent. It simply says that to predicate a CPA claim on the lack of informed consent there must be some showing that "lack of informed consent result[ed] from dishonest or unfair practices motivated by financial gain." *Id.*

Chapter 7.70 RCW clearly governs all actions for damages *based on injuries resulting from health care. Branom*, 94 Wn. App. at 969. Entrepreneurial activities, however, are not health care. They do not involve " 'the process in which [a physician is] utilizing the skills which he [or she]

[2] 66 Wn. App. 56, 831 P.2d 167 (1992).

had been taught in examining, diagnosing, treating or caring for the plaintiff as his [or her] patient.'" *Id.* at 969-70 (quoting *Linville*, 75 Wn. App. at 439) (first alteration in original).

A plaintiff should, therefore, be allowed to bring an independent action against a doctor alleging that entrepreneurial activities violate the CPA. Whether Dr. Jeckle has in fact engaged in entrepreneurial activities which violate the CPA is a question of fact. Reduced to its essence, the plaintiffs' argument here is that Dr. Jeckle was not practicing medicine. He was in the business of selling diet drugs. *Eriks*, 118 Wn.2d at 465 (citing *Quimby*, 45 Wn. App. at 182).

The trial court erred by dismissing Wright's CPA claim. The judgment of the trial court is reversed and the case remanded for trial.

KURTZ, C.J., and KATO, J., concur.

Reconsideration granted in part and opinion modified March 6, 2001.

Review denied at 144 Wn.2d 1011 (2001).